AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original     ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>Christopher Joseph Antoun,<br><br>Defendant(s) | Case No.  2:21-mj-05349-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT
11/20/21
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ro___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 3, 2020 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threats by Interstate Communication |

This criminal complaint is based on these facts:

  *Please see attached affidavit.*

  ☒ Continued on the attached sheet.

/s/
Complainant's signature

Thomas Smith, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     11/20/21

John E. McDermott
Judge's signature

City and state:  Los Angeles, California         Hon. John E. McDermott, U.S. Magistrate Judge
Printed name and title

AUSA:  Jason C. Pang

**AFFIDAVIT**

I, Thomas Smith, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Christopher Joseph ANTOUN ("ANTOUN") for a violation of 18 U.S.C. § 875(c) (Threats by Interstate Communication).

2. This affidavit is also made in support of warrants to search the person of ANTOUN and 20722 Ibex Avenue, Lakewood, CA (the "SUBJECT PREMISES"), as fully described in Attachments A-1 and A-2.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 875(c), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

## INTRODUCTION

4. I am a Special Agent with the Department of Homeland Security ("DHS"), Federal Protective Service ("FPS"). I have been an FPS Special Agent for the past three years and am currently assigned as a member of the Joint-Terrorism Task Force with the Federal Bureau of Investigation ("FBI"). In addition to participating in FBI counter-terrorism investigations, I am the case agent and co-case agent to numerous FPS investigations. Prior to becoming a Special Agent, I was assigned as a Uniformed Inspector for the FPS for four years. As a Uniformed Inspector, I performed security duties for federal facilities in

Washington, D.C., and Albuquerque, New Mexico.  In 2008, I received over 440 hours of training in investigations at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have also received over 168 hours of Threat Assessment and Management and Physical Security Training.  As a federal law enforcement officer, I have investigated over 100 cases involving criminal threats.

   5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. SUMMARY OF PROBABLE CAUSE

   6.   On or about May 3, 2020, in response to his inability to obtain a United States Small Business Administration ("SBA") COVID-19 Economic Injury Disaster Loan ("EIDL") loan and advance, ANTOUN emailed an SBA email account, "IT GOES INTO MY BANK ACCOUNT TONIGHT OR I START BOMBING EVERY LOCATION OWNED BY THE SBA."

   7.   A year later, on November 17, 2021, ANTOUN emailed a group of SBA employees, "Within the next hour I'm getting picked up and dropped off at the LA district office. Im gonna walk in with my nice shiny bat. Im gonna start beating the skulls of SBA

staff in. Once the police or whoever it is eventually stops me im going to go to jail."

### III. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, my interviews with victims and witnesses, and my own knowledge of the investigation, I am aware of the following:

**A. On May 3, 2020, ANTOUN Threatens to Bomb Every Location Owned by the SBA**

9. ANTOUN owns Federal Student Loan Consulting LLC, a business that ANTOUN runs out of the SUBJECT PREMISES. In early 2020, ANTOUN attempted to obtain a COVID-19 EIDL loan and advance from the SBA.

10. After failing to receive approval for a EIDL loan or advance from the SBA, on May 3, 2020, ANTOUN sent an email from his email address, antounchris432@gmail.com, to an SBA-monitored email account, PDC.Reconsideration@sba.gov, and wrote:

> IM NOT FUKING PLAYING WITH YOU COCK SUCKERS ANYMORE. IT'S NOT UP TO YOUR LOAN OFFICER AS TO WETHER OR NOT I GET THE EIDL LOAN ADVANCE. IM AN ELIGIBLE ENTITY. THEY HAVE 0 SAY SO IN THE MATTER. YOU MOTHER FUCKERS OWE ME $1000 AND I WANT IT RIGHT FUKING NOW. IT GOES INTO MY BANK ACCOUNT TONIGHT OR I START BOMBING EVERY LOCATION OWNED BY THE SBA.

11. C.P., an SBA loan officer based in Fort Worth, Texas, received ANTOUN's May 3, 2020 email while monitoring the PDC.Reconsideration@sba.gov email account and contacted law enforcement.

12. On May 11, 2020, law enforcement went to the SUBJECT PREMISES and conducted a voluntary interview of ANTOUN. ANTOUN stated, in part and in substance:

      a.    ANTOUN stated he lives at the SUBJECT PREMISES.

      b.    ANTOUN admitted that he sent the May 3, 2020 email from his email address, antounchris432@gmail.com, to the SBA because he was angry that his application to obtain an EIDL loan and loan advance had been denied by the SBA.

      c.    ANTOUN claimed that he was high on marijuana and drunk on alcohol when he sent the threatening email, and that the had no intent to actually carry out the threat.  ANTOUN also claimed that he had no training or experience with explosives or firearms.

13.  Law enforcement informed ANTOUN that law enforcement considered ANTOUN's May 3, 2020 threat to be a true and serious threat.  In response, ANTOUN acknowledged and stated that he would not make additional threats to any government agencies.

14.  ANTOUN gave consent to search the SUBJECT PREMISES, and law enforcement did not find any firearms or explosives in the house.

15.  On or about May 19, 2020, I served a letter to ANTOUN.  In that letter, I summarized the May 3, 2020 threat and warned ANOTUN that law enforcement is taking his threat "very seriously and aggressively investigating" them.  ANTOUN signed the letter following receipt.

**B.    On November 19, 2021, ANTOUN Threatens to Walk Into the SBA Los Angeles District Office and "Start Beating the Skulls of SBA Staff."**

16.  In the summer and fall of 2021, ANTOUN again attempted to obtain SBA-backed loans and loan advances.  Following difficulty in obtaining those loan and loan advances, on

4

November 17, 2021, ANTOUN sent the following email from fslcadm@gmail.com to several, specific SBA employees and other SBA email addresses:

> i dont care about the money anymore. You clearly arent going to give it to me even tho YOURE SUPPOSED TO SINCE I LEGALLY QUALIFY! But fuck it.
>
> All i care about now is making sure you fucks start suffering some consequences. So check this out im sending this email to 15 different inboxes because I want to make sure its seen.
>
> Within the next hour I'm getting picked up and dropped off at the LA district office. Im gonna walk in with my nice shiny bat. Im gonna start beating the skulls of SBA staff in. Once the police or whoever it is eventually stops me im going to go to jail. But im almost positive the story will make the news.
>
> During the news coverage im sure someone will ask... Gee i wonder what caused this man to do this??? AND THEN IM GONNA HAVE MY FATHER GIVE HIM EVERY PIECE OF CORRESPONDENCE IVE HAD WITH YOUR ORGANIZATION INCLUDING THIS EMAIL. THAT WAY THE NEWS STATION AND PEOPLE SEE THE FRAUDULENT SHIT BEING PULLED BY THE SBA.
>
> even if i never get the money and i end up going to jail for the next few years ill be happy. Happy knowing that you mother fuckers are finally about to start suffering some consequences.
>
> THINK IM BULLSHITTING YOU?
>
> guess youre gonna find out.

17. The header of the email came from "Christopher Antoun," and the email also contained the following signature block showing that the email was signed by ANTOUN:

> Christopher J. Antoun
> Student Loan Adviser # 0119
> Main: (800) -791-2931
> support@federalstudentloanconsulting.com

18. Following receipt of the email, SBA supervisors checked and confirmed that no SBA employees were physically

5

located at the SBA Los Angeles District Office, located at 312 N. Spring Street in Los Angeles, California. SBA supervisors also notified building security guards of ANTOUN's threat.

**C. Follow-up Investigation**

19. Based on my review of law enforcement and public databases on November 20, 2021, ANTOUN's present, registered residential address is the SUBJECT PREMISES. Likewise, on November 20, 2021, I reviewed ANTOUN's public LinkedIn page, and ANTOUN lists the current address of his business, Federal Student Loan Consulting LLC, as the SUBJECT PREMISES.

## IV. TRAINING AND EXPERIENCE ON CRIMINAL THREATS

20. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct investigations into criminal threats, I am aware that persons who send electronic communications, such as emails, text messages, and social media messaging applications, containing threats to kill or injure others will send those communications from digital devices under their physical control, such as on their person or in their residence. These digital devices include, but are not limited to, cell phones and laptops.

21. Additionally, I know from my training and experience that individuals who make violent threats may keep dangerous weapons in their possession or residence, including firearms, explosive devices, and blunt-force objects, such as baseball bats.

6

## V.     TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

i. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

9

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

  ii. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

  iii. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ANTOUN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ANTOUN's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

25. For all the reasons described above, there is probable cause to believe that ANTOUN violated 18 U.S.C. § 875(c) (Threats by Interstate Communication). Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of

violations of the Subject Offense will be found on the person of ANTOUN and in the SUBJECT PREMISES, as described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>20th</u> day of
<u>November</u>, 2021.

*John E. McDermott*

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

11